UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA,                                                        Plaintiff,

v.                                                          Criminal Action No. 3:20-cr-53-DJH

DE'AISJIA S. SHRIVERS,                                                          Defendant.

* * * * *

## MEMORANDUM OPINION AND ORDER

Police initially stopped and detained Defendant De'Aisjia Shrivers following a traffic stop at approximately 1:50 a.m. on June 3, 2020. (Docket No. 36, PageID # 156) The officers stopped her for apparent violation of a temporary curfew. (*Id.*) During the stop, officers seized a firearm and determined that the firearm was stolen. (D.N. 38, PageID # 171–72) Based at least in part on that evidence, a federal grand jury indicted Shrivers on charges of possessing a stolen firearm. (D.N. 1, PageID # 1) In a superseding indictment, Shrivers was also charged with stealing firearms from a licensed firearms dealer. (D.N. 18, PageID # 34) Shrivers now moves to "suppress any evidence obtained in the search of the [d]efendant's person and her vehicle on or about June [3], 2020," any evidence on Shrivers's cell phone, and any statements Shrivers made on June 3, 2020; during the subsequent interview on June 11, 2020; and following her arrest on June 19, 2020. (D.N. 26, PageID # 60; D.N. 59, PageID # 275) For the reasons discussed below, the Court will suppress the statements made by Shrivers after she was subjected to custodial interrogation on June 3, 2020 but will deny the rest of Shrivers's motion.

## I.

### A.    Traffic Stop

On June 1, 2020, the mayor of St. Matthews issued Executive Order 20-04, which established a curfew from 9:00 p.m. to 6:30 a.m. each night from May 30, 2020, to June 2, 2020. (D.N. 32, City of St. Matthews Executive Order # 20-04)  The mayor established the curfew in response to "protest[s] which have resulted in widespread property damage, looting and other unlawful conduct in Louisville Metro." (*Id.*)  The next day the mayor extended the curfew until the morning of June 8, 2020. (*Id.*)  The curfew did not apply "to individuals who are commuting to a place of work, house of worship for services or involved in any action that is medically necessary to protect a friend or family member." (*Id.*)  The Executive Order bears the signature of the mayor of St. Matthews and the city clerk. (*Id.*)

On June 3, 2020, at approximately 1:50 a.m., St. Matthews Police Officer Larry Kaufman pulled Shrivers over for violating the curfew. (D.N. 33, PageID # 89–90)  Kaufman approached Shrivers in a full, distinctive uniform with his badge showing. (*Id.*, PageID # 114)  Kaufman ordered Shrivers out of the vehicle and conducted a pat-down search of her person. (D.N. 32, Gov. Exh. 2, 1:38–2:10)  According to Kaufman, the pat down was for officer safety.[1] (D.N. 33, PageID # 94)

While Kaufman patted down Shrivers, St. Matthews Police Officer Scott Ratliff approached the other side of the vehicle and had the passenger step out, at which point Ratliff

---

[1] Shrivers argues that she was frisked in violation of *Terry*. (D.N. 38, PageID # 184)  Even assuming this is true, the officers seized no evidence in the frisk, and the frisk did not justify any later search or seizure. (D.N. 33, PageID # 94; D.N. 38, PageID # 184)  The frisk therefore produced no evidence that could be suppressed. *See United States v. Buford*, 632 F.3d 264, 270 (6th Cir. 2011) (citing *Herring v. United States*, 129 S. Ct. 695, 699 (2009)) (noting that the exclusionary rule applies to improperly obtained evidence).

immediately smelled "the odor of marijuana inside the vehicle." (*Id.*, PageID # 119)  Ratliff searched the vehicle for marijuana and discovered a firearm under the passenger seat. (*Id.*, PageID # 120; D.N. 32, Gov. Exh. 2, 2:05–2:07)  At the time Ratliff discovered the firearm, the officers did not know that the firearm was stolen.  (D.N. 33, PageID # 99)  Ratliff asked where the marijuana was located in the vehicle, and Shrivers stated that they had smoked all the marijuana. (D.N. 32, Gov. Exh. 2, 2:10–2:13)  Following this discussion, Ratliff seized the firearm, and Kaufman placed Shrivers in handcuffs.  (*Id.*, 2:17–2:21)

Once Shrivers was handcuffed, Officer Ratliff asked a series of questions that he testified were directed at the passenger.  (D.N. 33, PageID # 123)  First, Ratliff asked who owned the vehicle, and Shrivers responded that it was her vehicle.  (D.N. 32, Gov. Exh. 2, 2:27–2:30)  Ratliff then inquired about who owned the firearm, and Shrivers answered that it was her friend's firearm. (*Id.*, 2:30–2:34)  After Shrivers answered, Ratliff questioned whether the two women intended to shoot his partner with the firearm, and Shrivers stated, "No we weren't going to shoot.  It ain't got no bullets."  (*Id.*, 2:35–2:42)

Following this discussion, Ratliff continued to search the vehicle and found marijuana in the "cup holder area" of the vehicle.  (D.N. 33, PageID # 126)  Officer Kaufman testified that this marijuana was "not enough to really amount to anything" and that he believed that Shrivers had smoked whatever marijuana she had because he "could smell marijuana in the vehicle."  (*Id.*, PageID # 96)  After the officers completed searching the vehicle, Kaufman asked Shrivers a number of questions as he prepared to write Shrivers a citation.  (D.N. 32, Gov. Exh. 2, 3:25–4:55) During this exchange, Shrivers was still in handcuffs (*id.*), and Kaufman testified that he did not advise Shrivers of her *Miranda* rights because they were not "needed for any further investigation of anything at that point."  (D.N. 33, PageID # 92)

As Kaufman questioned Shrivers about what she was doing out past curfew, Officer Ratliff approached and told Kaufman that they were "running around with a stolen gun and some weed." (D.N. 32, Gov. Exh. 2, 9:45–10:00)  Shrivers then stated, "I knew that mother****** was dirty bro." (*Id.*, 10:07–10:11)  After this interaction, Kaufman continued to question Shrivers. (*Id.*, 10:19–10:27)  Officer Kaufman then cited Shrivers for possession of a stolen firearm and driving without an operator's license, but he did not cite her for violating the curfew or for possessing marijuana. (D.N. 33, PageID # 96–97)  The officers removed Shrivers's handcuffs and allowed the passenger, who had a driver's license, to drive Shrivers home. (*Id.*, PageID # 96)

## B.    June 11, 2020 Interview

Agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives went to interview Shrivers at her mother's residence on June 11, 2020. (*Id.*, PageID # 129–30)  In this interview, the agents asked Shrivers how the firearm got in her vehicle. (D.N. 28-2, Gov. Exh. 2, :30–35)  Shrivers stated that she gave a friend a ride, and he asked to leave the firearm in her car while he visited his child. (*Id.*, 1:41–2:12)  Shrivers did not know his name, but she was able to identify him after an agent showed her a photograph. (*Id.*; *id.*, 8:05–8:15)  The agents asked if Shrivers was near the robbery, and Shrivers indicated that she was not and had just heard about the robbery on Facebook. (*Id.*, 27:06–27:35)  After asking about the firearm and the robbery, the agents stated that they were not there to get Shrivers in trouble but that she could find herself in trouble if she lied during the interview. (*Id.*, 33:25–34:00)  Shrivers initially moved to suppress the statements made during this interview but, in her post-hearing brief, she concedes that these statements are admissible because she was not in custody. (D.N. 38, PageID # 197)

C.      **June 19, 2020 Arrest**

On June 19, 2020, ATF agents arrived at Shrivers's apartment to arrest her.  (D.N. 51, PageID # 215)  The agents had a warrant to arrest Shrivers but did not have a warrant to search her apartment.  (*Id.*, PageID # 219–220)  Agent Alexander Sanchez testified that he knocked on the door and asked Shrivers to immediately come outside after she answered the door.  (*Id*, PageID # 215)  While another agent patted down Shrivers, Shrivers indicated that she needed her shoes.  (*Id.*)  Sanchez entered the apartment to collect Shrivers's shoes and saw her friend Katie.  (*Id.*, PageID # 216)  Shrivers spoke to Katie, giving her the pass code to her cell phone and asking her to call Shrivers's mother.  (*Id.*, PageID # 216, 221)  Sanchez observed two cell phones on an end table and asked Katie to identify Shrivers's phone.  (*Id.*, PageID # 216)  Katie pointed to Shrivers's phone, and Sanchez decided to seize Shrivers's phone.  (*Id.*, PageID # 216–17)

When asked why he seized Shrivers's cell phone, Agent Sanchez testified that a cooperating witness had informed the agents that there were pictures on Shrivers's cell phone[2] of a flat-screen TV that matched the description of a TV that had also been stolen during a burglary of Stewart's Pawn Shop.  (*Id.*, PageID # 224)  Based on this information and the fact that Shrivers was being arrested for possession of a firearm that had been stolen from Stewart's Pawn Shop, Sanchez testified that he needed to seize the cell phone to prevent the destruction of evidence.  (*Id.*, PageID # 216–17; D.N. 55, PageID # 246)  After seizing Shrivers's cell phone, Agent Sanchez put the phone in "airplane" mode to prevent remote destruction of any evidence on the phone.[3]  (D.N. 51, PageID # 218)

---

[2] Agent Sanchez did not know if the confidential informant identified the type of cell phone Shrivers owned.  (D.N. 51, PageID # 223–224)
[3] When the government subsequently obtained a search warrant for the cell phone, agents used Shrivers's passcode to access and search the phone.  (D.N. 51, PageID # 219)

5

The agents then transported Shrivers to Oldham County Detention Center. (D.N. 28, PageID # 69) During the ride, agents read Shrivers her *Miranda* rights and asked if she understood those rights. (D.N. 28-3, Gov. Exh. 3, :10–:29) Shrivers acknowledged that she understood her rights. (*Id.*, :26–:29) The agents explained that she was being arrested for possession of a stolen firearm. (*Id.*, :56–1:05) The agents asked why Shrivers had been at Stewart's Pawn Shop the night of the burglary and if her friend, who allegedly owned the firearm, had entered her vehicle that night. (*Id.*, 1:05–1:20) Shrivers stated that her friend did get in her vehicle and that his blood was on her seatbelt. (*Id.*, 1:20–1:52) The agents informed Shrivers that her arrest was the result of her lying in the previous interview and asked if she wanted to cooperate and explain the situation. (*Id.*, 3:15–3:27) The agents noted that the government could bring additional charges. (*Id.*, 3:15–3:27) After speaking with the agents for a few minutes, Shrivers stopped speaking, and the agents ended the questioning at that time. (*Id.*, 6:56)

## II.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, [the Supreme Court] has inferred that a warrant must generally be secured." *Kentucky v. King*, 563 U.S. 452, 459 (2011). But "this presumption may be overcome in some circumstances because 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). As a result, "the warrant requirement is subject to certain reasonable exceptions." *Id.* (citing *Brigham City*, 547 U.S. at 403). Shrivers argues that the government has failed to establish that its conduct on June 3, 2020, and June 19, 2020, complies

with the warrant requirement or an applicable exception to that requirement.  (D.N. 38, PageID # 177, 190, 199; D.N. 59, PageID # 260)

## A.     Suppression of the Firearm

Shrivers raises three main arguments for the suppression of the firearm recovered from her vehicle on June 3, 2020.  First, Shrivers asserts that the officers did not have a permissible basis for conducting the traffic stop that led to officers recovering the firearm.  (D.N. 38, PageID # 178) Second, Shrivers argues that even if the traffic stop was permissible, officers lacked probable cause to search the vehicle for evidence of a crime.  (*Id.*, PageID # 186)  Finally, Shrivers contends that the officers improperly seized the firearm without a warrant.  (*Id.*)

### i.      Traffic Stop

The government asserts that officers pulled Shrivers over for violating the Executive Order that established a curfew.  (D.N. 36, PageID # 156)  In response, Shrivers argues that the Executive Order is invalid (D.N. 38, PageID # 178), that the curfew amounts to an unconstitutional checkpoint to deter general crime (*id.*, PageID # 181), and that the Executive Order cannot serve as a basis for the traffic stop in any event because the officers never determined if Shrivers was actually violating the curfew.  (*Id.*, PageID # 183)

Chapter 39 of the Kentucky Revised Statutes sets out the process for the valid exercise of the mayor's emergency authority.  Ky. Rev. Stat. § 39A.010(2).  The mayor of a city or urban-county government may "declare curfews and establish their limits" in the event of the occurrence of a situation or event contemplated by Ky. Rev. Stat. §§ 39A.010, 39A.020, or 39A.030.  Ky. Rev. Stat. § 39A.100(3)(c).  Section 39A.010 contemplates both "riot" and "civil disorder" as emergencies, and these events therefore authorize a mayor to declare a curfew.  Ky. Rev. Stat. § 39A.100(3)(c).  Executive orders authorized by Chapters 39A to 39F have the full force of law

7

if promulgated by an agency or political subdivision of the state "when filed in the office of the clerk of that political subdivision or agency." Ky. Rev. Stat. § 39A.180 (1998) (current version at Ky. Rev. Stat. § 39A.180).[4]  An officer may arrest any person violating an executive order in the officer's presence so long as the officer is in full, distinctive uniform.  Ky. Rev. Stat. § 39A.190.

St. Matthews Executive Order 20-04 states that the mayor is declaring the curfew in response to "recent events over the last four nights related to protest [sic] which have resulted in widespread property damage, looting and other unlawful conduct in Louisville Metro," which constitutes the "riot" or "civil disorder" necessary for the mayor to establish a curfew under Ky. Rev. Stat. § 39A.100(3)(c).  (D.N. 32, Gov. Exh. 1) *see* Ky. Rev. Stat. § 39A.010.  The Executive Order bears the signature of both the mayor and the city clerk indicating that it was properly filed in the St. Matthews Clerk's office and thus has the force of law.  Ky. Rev. Stat. § 39A.180 (1998). The Court finds therefore that the curfew in effect on June 3, 2020 was issued consistent with Kentucky law.[5]  Further, Officer Kaufman had the apparent authority to cite or arrest Shrivers if she was violating the curfew.  Ky. Rev. Stat. § 39A.190.  Kaufman testified, and the video evidence

---

[4] On February 2, 2021, the General Assembly of the Commonwealth of Kentucky amended Ky. Rev. Stat. § 39A.180 to remove the requirement that executive orders be filed in the office of the clerk of a political subdivision.  2021 Ky. Acts Ch. 6 (SB 1).  Instead, all executive orders authorized by Chapters 39A to 39F must now be filed with the Legislative Research Commission. *Id.*

[5] Although Shrivers does not raise a constitutional challenge to the mayor's authority to unilaterally institute a curfew, the Court notes that other courts have upheld similar curfews issued pursuant to emergency authority in response to civil unrest. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1142–43 (9th Cir. 2005) (upholding curfew issued by the mayor in response to civil disorder surrounding World Trade Organization meetings); *United States v. Chalk*, 441 F.2d 1277, 1283 (4th Cir. 1977) (upholding validity of a temporary curfew issued pursuant to state law in response to civil unrest); *Embry v. City of Cloverport, Ky.*, No. 3:02-cv-560-JGH, 2004 WL 191613, at *3 (W.D. Ky. Jan. 22, 2004) (noting that courts have allowed broad curfews on a temporary basis "in cases of an immediate threat to public safety" such as civil unrest (citations omitted)).

demonstrated, that he was in uniform and pulled Shrivers over for being out when the curfew was in effect.  (D.N. 33, PageID # 114) *see* Ky. Rev. Stat. § 39A.190.

Shrivers next argues that the Executive Order cannot serve as a basis for the traffic stop because it amounts to an unconstitutional checkpoint to deter general crime.  (D.N. 38, PageID # 181 (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 41–42 (2000)))  In *Edmond*, the Supreme Court invalidated suspicionless seizures at checkpoints that were meant to detect "ordinary criminal wrongdoing."  531 U.S. at 41–42.  The curfew in this case, however, is not a suspicionless seizure for the purpose of detecting criminal activity.[6]  The curfew establishes an offense that subjects an individual to arrest pursuant to Kentucky law.  *See* Ky. Rev. Stat. § 39A.190.  Thus, when a law-enforcement officer pulls a suspect over to investigate a potential violation of  Executive Order 20-04, the officer is not conducting a suspicionless seizure but is instead seizing the individual for a specific violation of Kentucky law.  As a result, the Supreme Court's precedent on suspicionless stops at checkpoints is inapplicable to Shrivers's traffic stop because the officers purportedly stopped her based on an individualized suspicion that she violated Executive Order 20-04.  *See Edmond*, 531 U.S. at 41 (noting that the Supreme Court's checkpoint cases are limited exceptions to the "general rule that a seizure must be accompanied by some measure of individualized suspicion").

Even if Executive Order 20-04 properly gives officers the authority to stop individuals for violating the curfew, Shrivers asserts that the officers impermissibly stopped her because they did

---

[6] In her attempt to analogize the curfew to a suspicionless seizure, Shrivers argues that the purpose of the curfew is to control general crimes.  (D.N 38, PageID # 181)  But unlike the checkpoints in *Edmond* that had the stated goal of detecting criminal activity, 531 U.S. at 41–42, the Executive Order makes no assertion that the goal is to detect criminal activity.  Instead, the Executive Order refers to prior criminal activity and institutes the curfew presumably to prevent future criminal activity. (*See* D.N. 32, City of St. Matthews Executive Order # 20-04) *see Chalk*, 441 F.2d at 1283 (upholding seizure of firearm during a traffic stop premised on a violation of temporary curfew).

not know whether she had actually violated the curfew or she met one of the exceptions to the curfew.  (D.N. 38, PageID # 183)  A police officer may lawfully stop a motorist, however, if the officer has probable cause to believe that a motorist violated the law.  *United States v. Parker*, 17 F. Supp. 3d 667, 670 (W.D. Ky. 2014) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc), *cert. denied*, 513 U.S. 828 (1994).  In analyzing the reasonableness of a traffic stop, the Court asks "whether the police officer possessed probable cause or reasonable suspicion to believe that a traffic violation occurred, not whether a traffic violation in fact occurred."  *United States v. Sanford*, 476 F.3d 391, 396 n.2 (6th Cir. 2007).  "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment."  *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (citing *Ferguson*, 8 F.3d at 391).

To determine whether officers had probable cause to conduct a traffic stop, courts look to whether the officers had "reasonable grounds for [their] belief [that a violation occurred], supported by less than prima facie proof but more than [a] mere suspicion."  *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003) (citation omitted).  A court must determine whether "'the facts and circumstances within [the officers'] knowledge and of which they had reasonable trustworthy information [were] sufficient in themselves to warrant a [person] of reasonable caution in the belief that' an offense has been or is being committed."  *United States v. Hughes*, 606 F.3d 311, 320 (6th Cir. 2010) (quoting *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005)).  The probable-cause standard is objective; "[s]ubjective intentions play no role in probable cause Fourth Amendment analysis."  *Schneider v. Franklin Cnty.*, 288 F. App'x 247, 251 (6th Cir. 2008) (citing *Whren*, 517 U.S. at 810).  The relevant inquiry in traffic-stop cases is "whether this particular

officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop." *Ferguson*, 8 F.3d at 391.

On June 3, 2020, the curfew was in effect, and Officer Kaufman observed Shrivers driving a vehicle around 1:50 a.m. within the temporarily-restricted time period. (D.N. 33, PageID # 89–90) This knowledge would "warrant a [person] of reasonable caution" to believe that Shrivers was violating curfew by being out past 9:00 p.m. *Hughes*, 606 F.3d at 320 (quoting *Davis*, 430 F.3d at 352). The fact that Kaufman did not know with certainty that Shrivers was violating the curfew does not preclude Kaufman from having probable cause to conduct a traffic stop, *Sanford*, 476 F.3d at 396 n.2, and the Court concludes therefore that Kaufman's observation of Shrivers in a vehicle after curfew establishes probable cause to conduct a traffic stop. *Copeland*, 321 F.3d at 592.

### ii.    Search of the Vehicle

Shrivers argues that even if the traffic stop was valid, the officers lacked a basis to search her vehicle. (D.N. 38, PageID # 186) Under the automobile exception to the warrant requirement, officers may conduct a "warrantless search of an automobile if [the] officers have probable cause to believe the vehicle contains evidence of a crime." *United States v. Galaviz*, 645 F.3d 347, 357 (6th Cir. 2011) (citing *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)). "[A]n officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search." *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002) (citing *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993)).

Ratliff testified that when he asked the passenger to step out of the vehicle, he immediately smelled marijuana in the vehicle. (D.N. 33, PageID # 119) Shrivers asserts that this testimony is not credible because the officers did not seize any marijuana and did not charge Shrivers with any

drug crimes.  (D.N. 38, PageID # 186–87)  The fact that the officers did not charge Shrivers with a drug crime, however, has no bearing on the Court's analysis of whether Kaufman had probable cause to believe Shrivers's vehicle contained evidence of a crime.  *United States v. Massenberg*, No. 4:11-cr-4-FL, 2011 U.S. Dist. LEXIS 92744, at *18 (E.D.N.C. Aug. 17, 2011) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also Texas v. Brown*, 460 U.S. 730, 742 (1983) ("[Probable cause] does not demand any showing that [the officer's belief be correct or more likely true than false.").  Officer Ratliff consistently testified that he searched the vehicle for evidence of a drug crime because he smelled marijuana when the passenger opened the vehicle door.  (D.N. 33, PageID # 119)  The Court finds this testimony credible and concludes therefore that Ratliff had probable cause to search the vehicle for evidence of a crime under the automobile exception.  *See Galaviz*, 645 F.3d at 357 (citing *Smith*, 510 F.3d at 647).

### iii.     Seizure of the Firearm

Shrivers's final argument alleges that the firearm must be suppressed because the officers improperly seized the firearm without a warrant.  (D.N. 38, PageID # 185–86)  An officer may seize a firearm without a warrant under the plain-view exception when the officer is lawfully in the position where he discovers the firearm, the firearm's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object.  *Galaviz*, 645 F.3d at 355 (quoting *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007).  Because the officers had probable cause to search Shrivers's vehicle, *supra* part II(A)(ii), the only element at issue is whether the firearm's incriminating nature was "immediately apparent."

To determine whether the criminality of a piece of evidence is "immediately apparent," the Court considers:

(1) the nexus between the seized item and the items particularized in the warrant,
(2) whether the intrinsic nature or appearance of the item gives probable cause to

> believe it is associated with criminal activity, (3) whether the officers, at the time
> of discovery of the item and with the facts then available, can determine probable
> cause of the item's incriminating nature, and (4) whether the officer can recognize
> the incriminating nature of the item as the result of his instantaneous sensory
> perception.

*United States v. Mathis*, 738 F.3d 719, 732 (6th Cir. 2013) (citing *United States v. Garcia*, 496

F.3d 495, 510–11 (6th Cir. 2007)).  "[W]hile none of these factors is necessary, they are instructive

as to what [the Sixth Circuit] has used to find that the criminality of a piece of evidence was

'immediately apparent.'"  *United States v. McLevain*, 310 F.3d 434, 441 (6th Cir. 2002) (citing

*United States v. Beal*, 810 F.2d 574, 576–77 (6th Cir. 1987)).  "[A]n object's incriminating nature

is not immediately apparent if it 'appears suspicious to an officer but further investigation is

required to establish probable cause as to its association with criminal activity.'"  *Garcia*, 496 F.3d

at 510 (6th Cir. 2007) (quoting *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 555 (6th Cir. 2003)).

Here, the first factor and second factor do not support the government's contention that the

firearm's incriminating nature was "immediately apparent" because the officers did not have a

search warrant for the firearm (*see* D.N. 33, PageID # 98–99), and the firearm's intrinsic nature

does not establish probable cause of criminal activity.  *See United States v. Salto-Garcia*, No. 5:18-

cr-44-REW, 2018 WL 3064279, at *5 (E.D. Ky. June 21, 2018) (finding that the second factor in

the "immediately apparent" analysis does not support seizure of a firearm because a firearm's

intrinsic nature "does not automatically give rise to probable cause of criminality" (citing

*McLevain*, 310 F.3d at 441)).  The third and fourth factors, however, support finding that the

firearm's incriminating nature was "immediately apparent."  At the time Officer Ratliff discovered

the firearm, he had probable cause to believe that the vehicle contained evidence of marijuana,

*supra* part II(A)(ii), and Ratliff therefore had probable cause to believe that the presence of the

firearm would subject Shrivers to an increased criminal penalty pursuant to Ky. Rev. Stat.

§ 218A.992. *Mathis*, 738 F.3d at 732. Ratliff could also recognize the incriminating nature of the firearm based on his "instantaneous sensory perception" that the firearm was located in a vehicle which Ratliff had probable cause to believe contained marijuana. *Id.* As a result, the Court finds that the incriminating nature of the firearm was "immediately apparent," and the plain-view exception therefore justified the initial warrantless seizure of the firearm.[7]

**B.     Statements by Shrivers on June 3, 2020**

The government seeks admission of two specific statements by Shrivers: (1) "[The firearm] ain't got no bullets" and (2) "I knew that mother****** was dirty bro." (D.N. 36, PageID # 161–62) While the United States argues that the Fifth Amendment does not bar admission of these two statements because they were volunteered (*id.*), it concedes that Shrivers was in custody after she was placed in handcuffs and that any other statements Shrivers made to the officers during questioning are inadmissible. (D.N. 33, PageID # 146–47) Shrivers contends that her statements were not voluntary and that they were given in direct response to police questioning or its "functional equivalent." (D.N. 38, PageID # 195–96)

*Miranda* warnings are required before law enforcement may engage in custodial interrogation. *United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013). "The *Miranda* exclusionary rule . . . sweeps more broadly than the Fifth Amendment itself . . . [and] may be triggered even in the absence of a Fifth Amendment violation." *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). "Thus, in the individual case, *Miranda's* preventative medicine provides a remedy

---

[7] The fact that officers did not ultimately seize marijuana or charge Shrivers with a drug offense does not affect this conclusion. Immediately after the initial seizure, Officer Ratliff investigated the firearm and discovered it was stolen. (D.N. 32, Gov. Exh. 2, 9:57–10:07) At that point, the stolen nature of the firearm justified the permanent seizure of the firearm. *See United States v. Frederick*, 152 F. App'x 470, 473 (6th Cir. 2005) ("What the officers learned after taking control of the weapon . . . gave them authority to seize the weapon permanently." (citations omitted)).

even to the defendant who has suffered no identifiable constitutional harm." *Id.* at 307 (citing *New York v. Quarles*, 467 U.S. 649, 654 (1983)). The "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." *Id.*

Because the government concedes that Shrivers was in custody (D.N. 33, PageID 146–47), and that the officers did not administer *Miranda* rights to Shrivers (*id.*, PageID # 92), the only issue is whether Shrivers was subjected to interrogation. *Woods*, 711 F.3d at 740. Interrogation includes not just express questions, but also includes words or actions "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

The government acknowledges that Shrivers was subject to direct questioning about the firearm before she made the purportedly voluntary statements. (D.N. 36, PageID # 161–62) These questions were "reasonably likely to elicit an incriminating response" from Shrivers about possessing a stolen firearm and therefore amount to interrogation. *Wood*, 711 F.3d at 740 (citation omitted). Since Shrivers was in custody and being interrogated, the *Miranda* exclusionary rule requires suppression of any statements given without the benefit of *Miranda* rights. *Elstad*, 470 at 307. Even assuming admission of Shrivers's statements would not violate the Fifth Amendment because they were volunteered, the statements are inadmissible because Shirvers made the statements throughout direct interrogation without the benefit of her *Miranda* rights. *Id.*; *see also United States v. Sangineto-Miranda*, 859 F.2d 1501, 1515–16 (6th Cir. 1988) ("When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial

in the government's case in chief." (citation omitted)).  The United States has not cited, and the Court has not found, any support for the proposition that a distinction can be drawn between direct responses to interrogation and purported voluntary statements under circumstances such as those at issue here for the purposes of the *Miranda* exclusionary rule.  As a result, all the statements Shrivers made after she was handcuffed including the two specific statements that the government asserts should be admissible.

## C.      Shrivers's Cell Phone

Shrivers also moves to suppress any evidence obtained from her cell phone.  (D.N. 59, PageID # 275)  In support, Shrivers asserts that the government impermissibly seized her cell phone without a warrant.  (*Id.*, PageID # 260)  Law-enforcement authorities may conduct a warrantless seizure of personal property when there is probable cause to believe the property contains evidence of a crime and a "recognized exception to the warrant requirement is present." *United States v. Saddler*, 498 F. App'x 524, 527 (6th Cir. 2012) (quoting *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997)).

### i.      Probable Cause

The government argues that probable cause existed to seize Shrivers's cell phone because a confidential informant provided information that the cell phone contained pictures of items stolen from Stewart's Pawn Shop and officers recovered a firearm stolen from Stewart's when they stopped Shrivers's vehicle.  (D.N. 55, PageID # 246)  Shrivers contends that the information from the confidential informant did not create probable cause to believe her cell phone contained evidence of a crime.[8]  (D.N. 59, PageID # 262)

---

[8] Shrivers also spends significant effort to distinguish the facts of her case from an out-of-circuit case cited by the government.  (D.N. 59, PageID # 260–62 (citing *United States v. Babcock*, 924 1180, 1185 (11th Cir. 2019)))  But the government only cites to the case to illustrate the probable-

Probable cause exists when there is "a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Rodriguez*, 716 F. App'x 387, 388–89 (6th Cir. 2017) (quoting *Gates*, 462 U.S. at 238). This is a "practical, common-sense" standard that takes into account "the totality of the circumstances" and allows the judge "to draw reasonable inferences about where evidence is likely to be kept." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 644 (6th Cir. 2003) (citations omitted); *see also Gates*, 462 U.S. at 238–40; *United States v. Brown*, 828 F.3d 375, 384 (6th Cir. 2016) (noting that the Supreme Court has rejected "'rigid rules, bright-line tests, and mechanical inquiries in favor of a more flexible, all-things-considered approach' when evaluating probable cause" (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013))).

Under the totality-of-the-circumstances approach, the Court considers the "veracity and basis of knowledge of a confidential informant" and "law enforcement's corroboration of the informant's tip." *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008) (citations omitted). "The information substantiating an informant's reliability need not be obtained from a source unrelated to the confidential informant, such as an independent police investigation or a second confidential informant, 'but may be any set of facts that support the accuracy of the information supplied by the informant.'" *United States v. Taylor*, 301 F. App'x 508, 513 (6th Cir. 2008) (quoting *United States v. May*, 399 F.3d 817, 824 (6th Cir. 2005)). An officer's statement that a confidential informant previously supplied information that led to successful seizures is sufficient to establish an informant's reliability. *Martin*, 526 F.3d at 937 (citations omitted).

---

cause standard and never argues that Shrivers's case is factually similar to *Babcock*. (D.N. 55, PageID 245–46) The Court acknowledges that there are factual differences between Shrivers's case and *Babcock*, but these factual differences do not resolve the pertinent question of whether the information available to law enforcement established a "fair probability" that Shrivers's cell phone contained evidence of a crime.

Here, Agent Sanchez testified that the confidential informant told officers that Shrivers's phone had pictures of a flat-screen TV.  (D.N. 51, PageID # 224)  This flat-screen TV matched the description of a TV that had been stolen from Stewart's Pawn Shop.  (*Id.*)  Shrivers correctly notes that the government elicited limited testimony about the confidential informant's tip and that Sanchez did not testify that this confidential informant had previously provided information to the officers.[9]  (D.N. 59, PageID # 266)  The lack of this testimony, however, does not make the confidential informant unreliable; Agent Sanchez testified about additional facts, such as the TV matching the description of the TV stolen from Stewart's Pawn Shop, that support the accuracy of the confidential informant's information.  *Taylor*, 301 F. App'x at 513 (citation omitted). Combined with the knowledge that Shrivers was arrested for possession of a firearm stolen from Stewart's Pawn Shop (D.N. 55, PageID # 246), the totality of the circumstances demonstrate that there was at least "a fair probability" that Shrivers's cell phone contained evidence of a crime. *Rodriguez*, 716 F. App'x at 388–89 (quoting *Gates*, 462 U.S. at 238).

## ii.     Exigent Circumstances

In addition to probable cause, one of the exceptions to the warrant requirement must be present to justify a warrantless seizure of Shrivers's cell phone.  *Saddler*, 498 F. App'x at 527 (citation omitted).  "One well-recognized exception [to the warrant requirement] applies when 'the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'"  *King*, 563 U.S. at 460 (quoting

---

[9] Shrivers also asserts that Agent Sanchez admitted that he found no incriminating information on the phone after using the passcode to unlock the cell phone.  (D.N. 59, PageID # 267)  Sanchez testified that when he seized the locked cell phone, he did not observe incriminating information on her phone background.  (D.N. 51, PageID # 225)  Sanchez also testified that the government did not unlock the cell phone and search it until after the government later obtained a search warrant for the phone.  (*Id.*, PageID # 219)  Shrivers's assertion is therefore unsupported by Sanchez's testimony.

*Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). "The need 'to prevent the imminent destruction of evidence' has long been recognized as sufficient justification for a warrantless search." *Id.* (quoting *Brigham City*, 547 U.S. at 403).

To establish exigent circumstances under the destruction-of-evidence exception, "the government must first show 'an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent.'" *Saddler*, 498 F. App'x at 528 (quoting *Sangineto-Miranda*, 859 F.2d at 1512). This requirement is satisfied where an officer has "(1) a reasonable belief that third parties are inside the dwelling; and (2) a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order." *United States v. Felix*, 711 F. App'x 259, 261–62 (6th Cir. 2017) (quoting *Sangineto-Miranda*, 859 F.2d at 1512). If the government has an objectively reasonable basis to believe that the destruction of evidence is imminent, the Court must also "balance the interests by weighing the governmental interests being served by the intrusion against the individual interest that would be protected if a warrant were required." *Saddler*, 498 F. App'x at 528 (citing *United States v. Plavcak*, 411 F.3d 655, 664 (6th Cir. 2005)).

At the time Agent Sanchez entered the house to retrieve Shrivers's shoes, he spotted Shrivers's friend Katie, and Shrivers began calling out the pass code to her cell phone and asking Katie to call her mother. (D.N. 51, PageID # 216) Shrivers argues that exigent circumstances did not exist because she did not tell Katie to destroy evidence on the phone, and Sanchez was not absolutely certain that Katie had knowledge of potential evidence on the phone. (D.N. 59, PageID # 270–72) Sanchez did not need to be completely certain, however, that Katie knew of and intended to destroy the potential evidence. Sanchez knew that Katie was in the apartment, that she could access and unlock Shrivers's cell phone, and that Katie was aware the police were actively

investigating and arresting Shrivers.  (D.N. 51, PageID # 215–18)  This evidence is sufficient to establish an objectively reasonable belief that the destruction of evidence could be imminent. *Felix*, 711 F. App'x at 261–62 (citation omitted).

The Court must also balance the governmental interests of the intrusion against the individual interests protected by the warrant requirement.  *Saddler*, 498 F. App'x at 528 (citation omitted).   In this case, the government has a significant interest in preventing the potential destruction of electronic evidence related to the pawn-shop burglary.  *United States v. Bradley*, 488 F. App'x 99, 104 (6th Cir. 2012) (noting "that the governmental interest in protecting evidence from destruction is particularly high where digital evidence is involved, because such evidence is inherently ephemeral and easily destructible" (citation omitted)).   Because the officers did not search Shrivers's cell phone until they secured a search warrant for the phone (D.N. 51, PageID # 219), the warrantless seizure affected only Shrivers's possessory interest in the phone and did not implicate any privacy interest.  *Bradley*, 488 F. App'x at 104 (citation omitted).  Courts have considered this lesser interference a factor when upholding warrantless seizures.  *Id.* (citations omitted).  In this case, the government's interest in preventing the potential destruction of evidence outweighs Shrivers's possessory interest in her cell phone, and the Court therefore concludes that exigent circumstances justified Agent Sanchez's warrantless seizure of Shrivers's phone.  *See United States v. Fletcher*, 978 F.3d 1009, 1019 (6th Cir. 2020) (noting that the government's interest in preventing the destruction of evidence is sufficiently addressed by seizing the phone, not searching it).

## D.     Statements by Shrivers on June 19, 2020

In addition to requesting suppression of the cell phone seized on June 19, 2020, Shrivers also moves to suppress any statements she made after being arrested.  (D.N. 38, PageID # 197)

Shrivers asserts that any statements she made must be suppressed because she did not waive her *Miranda* rights.  (*Id.*, PageID # 198)

> The *Miranda* waiver inquiry "has two distinct dimensions":
>
> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).  The "heavy burden" imposed by *Miranda* "is not more than the burden to establish waiver by a preponderance of the evidence."  *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).  The Sixth Circuit "has held that a *Miranda* 'waiver may be clearly inferred . . . when a defendant, after being properly informed of [her] rights and indicating that [s]he understands them, nevertheless does nothing to invoke those rights' and speaks."  *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (omission in original) (quoting *United States v. Nichols*, 512 F.3d 789, 798–99 (6th Cir. 2008)).

While transporting Shrivers to Oldham County Detention Center, the agents read Shrivers her *Miranda* rights and asked if she understood those rights.  (D.N. 28-3, Gov. Exh. 3, :10–:29)  Shrivers acknowledged that she understood her rights (*id.*, :26–:29), and Shrivers decided to answer some of the agent's questions.  (*Id.*, 1:20–1:52)  After a few minutes, Shrivers stopped answering question, and the agents did not continue to question Shrivers after that point.  (*Id.*, 6:56)  Shrivers presents no argument or evidence that she was intimidated or coerced into speaking with the agents.  Under these circumstances, the Court concludes that Shrivers's acknowledgment

of her rights and her subsequent decision to speak with the agents constitutes a valid waiver of her

*Miranda* rights.   *Adams*, 583 F.3d at 467 (citation omitted).

**III.**

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is

hereby

**ORDERED** that Shrivers's motion to suppress (D.N. 26) is **GRANTED in part**.

Statements made to law-enforcement officers on June 3, 2020 after Shrivers was handcuffed and

questioned are **SUPPRESSED**.   The remainder of Shrivers's motion to suppress is **DENIED**.

April 21, 2021

**David J. Hale, Judge**
**United States District Court**